IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TERRY C. JOHNSON #B-45089, | ) | |
| | ) | |
| Plaintiff, | ) | |
| -vs- | ) | No. 10-3279 |
| | ) | |
| MICHELLE R. B. SADDLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, MICHELLE SADDLER, LARRY PHILLIPS, JAMES
HAAGE, EUGENE MCADORY, JOSEPH HANKINS, AMY CLARK, MICHAEL KERR,
CHAD GODDARD, CLIFTON MCCALLA, JONATHON ANGEL, and RICHARD LOGAN,
by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and
in support of their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, states as
follows:

**INTRODUCTION**

Plaintiff, Terry Johnson, is currently a resident at the Rushville Treatment and
Detention Facility. On October 27, 2010, Plaintiff filed this civil rights lawsuit, pursuant to
42 U.S.C. § 1983, against Defendants Michelle Saddler, Larry Phillips, James Haage,
Eugene McAdory, Joseph Hankins, Amy Clark, Michael Kerr, Chad Goddard, Clifton
McCalla, Jonathan Angel, and Richard Logan. Plaintiff alleges four claims against the
Defendants relating to an extraction that occurred on July 2, 2010: (1) unconstitutional
force; (2) failure to intervene; (3) deliberate indifference to a serious medical condition; and

1

(4) unconstitutional conditions of confinement. For the reasons more fully explained below, the Defendants are entitled to summary judgment and Plaintiff's four claims should be dismissed.

First, there is no evidence that the Defendants used unconstitutional force on Plaintiff. The entire extraction – from the time Plaintiff was removed from his room to when he was escorted to a different room – was captured on video. The video recording clearly shows that the Defendants did not use unconstitutional force on Plaintiff and the force used was necessary to subdue, restrain, and safely escort the Plaintiff who was combative, hostile, and uncooperative with the Defendants throughout the entire incident.

Second, there is no evidence that the Defendants failed to intervene or protect the Plaintiff. As stated above, the video clearly shows no unconstitutional force was used on Plaintiff. There was no action that occurred which created a duty for the Defendants to intervene and, thus, no reason for the Defendants to believe that they needed to protect Plaintiff from any harm or serious risk of harm.

Third, there is no evidence that Defendants were deliberately indifferent to a serious medical condition. There is no evidence that Plaintiff suffered from a serious medical condition. The video recording and Plaintiff's medical records establish that Plaintiff did not have a serious medical condition. Furthermore, after Plaintiff was removed from his room he was immediately escorted to the Health Care Unit and examined by a nurse. The nurse determined that Plaintiff had no serious injuries and gave him a band-aid for a minor skin abrasion on his hand. Plaintiff was seen twice by medical professionals later that day and was visited everyday thereafter by medical professionals until he was examined by a doctor on July 12, 2010.

Fourth and finally, there is no evidence that Plaintiff suffered from any unconstitutional conditions of confinement. Plaintiff has no evidence that he suffered from exposure to cold temperatures for an extended period of time. The period of time that Plaintiff is complaining about being exposed to cold temperatures occurred in the month of July. In addition, the temperature in the residents' rooms at Rushville was set at seventy-two (72) degrees Fahrenheit. Plaintiff has no evidence that his room was in a filthy and unsanitary condition. Rather, the video shows the floors and walls of Plaintiff's room to be clean and suitable. Regardless, Plaintiff has no evidence that he suffered any physical injuries from the conditions of his room. In short, Plaintiff has no evidence that his room conditions rise to the level of a constitutional violation. As a result, the Defendants are entitled to summary judgment and Plaintiff's claims should be dismissed.

<u>**UNDISPUTED MATERIAL FACTS**</u>

1.      Plaintiff, Terry Johnson, is currently a resident at the Rushville Treatment and Detention Facility ("Rushville"). (Doc. 7, Amend. Compl).

2.      Plaintiff was on temporary special management status during July 1-12, 2010. (Ex. A, Eugene McAdory Affidavit, para. 3).

3.      Residents are placed on special management status when their behavior places them or others in immediate risk of harm or when they cannot be managed effectively in common areas or with the regular facility population. (Ex. A, Eugene McAdory Affidavit, para. 5)

4.      Residents may remain on Special Management Status until the Behavior Committee determines that the Resident is no longer a risk to self or others. (Ex. A, Eugene McAdory Affidavit, para. 4).

5.　　For the purposes of the count process and for the general safety of the facility and its residents, the Rushville staff must be able to see inside the residents' rooms to verify that the residents are in the appropriate place and to make sure that there is no safety, security, or immediate health issue present. (Ex. A, Eugene McAdory Affidavit, para. 8).

6.　　The doors at Rushville have a window, which allows the Rushville staff to properly perform the count process, to look into the room to verify that the residents are in the appropriate place and to make sure that there are no safety, security, or immediate health issues present. (Ex. A, Eugene McAdory Affidavit, para. 9).

7.　　When a resident's door window is covered or the view is obstructed, the Rushville staff cannot properly perform the count process, they cannot verify that the residents are in the appropriate place or make sure that there is no safety, security, or immediate health issue present. (Ex. A, Eugene McAdory Affidavit, para. 10).

8.　　On July 1, 2010, Security Therapy Aides ("STA") Chad Goddard ("Goddard"), Bryant Mayes ("Mayes"), and Josh Wilson ("Wilson") reported that they observed Plaintiff hitting his door, yelling "either writing tablet or tact team" and that he was "going to tear this mother fucker up," making loud banging noises in his room, and had covered his door window in the evening on July 1, 2010. (Ex. A, Eugene McAdory Affidavit, para. 13).

9.　　The Rushville staff performing the evening count and otherwise monitoring the residents needed to be able to look inside Plaintiff's room to verify that there was no safety, security, or immediate health issue present. (Ex. A, Eugene McAdory Affidavit, para. 14).

10.　　Due to Plaintiff's aggressive behavior and the fact that Plaintiff's door window was covered, the Rushville staff performing the evening count and otherwise monitoring

the residents did not open Plaintiff's door and go inside as a precaution to avoid being attacked by the resident when entering the room. (Ex. A, Eugene McAdory Affidavit, para.15).

11.    Based on the reports of Plaintiff's aggressive and destructive behavior and that Plaintiff had covered his door window, Defendant Eugene McAdory ("McAdory"), the Security Director at Rushville, decided that the Emergency Response Team ("ERT") was needed to escort Plaintiff to a new room so that the staff could remove the material covering the window and assess the condition and situation in Plaintiff's room. (Ex. A, Eugene McAdory Affidavit, para. 16).

12.    On the morning of July 2, 2010, Eugene McAdory directed the ERT to move Plaintiff to a new room. (Ex. A, Eugene McAdory Affidavit, para. 18).

13.    STA Charles Keller ("Keller") was a member of the ERT on July 2, 2010, and recorded the entire extraction and transportation of Plaintiff with a video recorder on July 2, 2010. (Ex. B, Charles Keller Affidavit and DVD, para. 3-4).[1] A copy of the video recording ("DVD") of the incident at issue is attached as Exhibit B.  (Ex. B, Charles Keller Affidavit and DVD, para. 5).

14.    The attached DVD of the extraction is a true and accurate depiction of the events that occurred on July 2, 2010. The DVD was not doctored or altered in any way. (Ex. B, Keller Affidavit and DVD, para 7).

15.    At approximately 8:45 a.m. on July 2, 2010, the ERT arrived at Plaintiff's room (Special Management Unit ("SMU") 1, Room 1) to move him from his room and

---

[1] This video is only being provided to the Court.  However, the parties have been given an opportunity to view the video

escort him to a new room (SMU 1, room 7). (Ex. B, DVD; Ex. C, Michael Kerr Affidavit, para.4).

16.　　Upon arriving at Plaintiff's room, the ERT's view was obstructed and hindered by the covering of the door window. (Ex. B, DVD; Ex. C, Kerr Affidavit, para.5).

17.　　The ERT was incapable of adequately assessing the situation within the room due to the obstructed view. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 6).

18.　　STA Richard Logan ("Logan"), a member of the ERT on July 2, 2010, initially gave Plaintiff three (3) loud verbal commands to come to the door chuckhole, turn around and be placed in handcuffs. (Ex. B, DVD; Ex. C, Kerr Affidavit, para.7).

19.　　During these commands, STA Logan informed and warned Plaintiff that if he refused the direct commands, the extraction team would be utilized to remove him. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 8).

20.　　While STA Logan was giving Plaintiff these commands, Plaintiff came to the door window, saw the ERT standing outside of the room, and acknowledged that he heard Logan's commands. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 9).

21.　　Plaintiff refused Logan's direct commands and then moved back away from the door. (Ex. B, DVD; Ex. C, Kerr Affidavit, para.10).

22.　　STA Logan proceeded to give Plaintiff three more loud verbal commands to come to the door and be placed in handcuffs; however, Plaintiff refused to comply with Logan's commands. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 11).

23.　　STA Logan instructed STA Amy Clark ("Clark") in the control room to unlock Terry Johnson's door. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 12).

24.     Plaintiff's room door was opened and four members of the ERT (Goddard, Kerr, Jonathon Angel ("Angel"), and Brandon Wear ("Wear")) entered Plaintiff's room to escort him out. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 13).

25.     Upon entering the room, the four members of the ERT had to avoid Plaintiff's property box and other property, which Plaintiff had placed in front of the door to obstruct them. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 14).

26.     As the four members of the ERT proceeded into the room, they encountered Plaintiff who was in a crouched stance and was physically combative and resisting the ERT. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 15).

27.     The ERT gave Plaintiff several loud commands to stop resisting and attempted to subdue him; however, Plaintiff refused and continued to be combative with the ERT. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 16).

28.     Eventually, the ERT was able to restrain Plaintiff on his bed. The ERT then assisted Plaintiff to his feet where he was placed in hand and leg restraints. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 17).

29.     Plaintiff was asked if he wanted to go to health care and he responded "yes." (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 18).

30.     The ERT escorted Plaintiff to the health care unit. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 18).

31.     STA Kerr did not punch Plaintiff in the face or anywhere else during the extraction in Plaintiff's room on July 2, 2010 or any other time. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 19).

32.     While the ERT was escorting Plaintiff to the health care unit, he refused to continue to walk and demanded that the ERT carry him the rest of the way. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 20).

33.     The ERT carried Plaintiff the rest of the way to the health care unit. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 21).

34.     While the ERT was carrying Plaintiff to the health care unit, Plaintiff threatened STA Kerr and told him that he was going to get STA Kerr back. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 22).

35.     STA Kerr did not attempt to or otherwise injure or break Plaintiff's neck, he did not try to or otherwise "cut off" Plaintiff's breathing, and he did not "smash" Plaintiff's face into his vest during the extraction or otherwise on July 2, 2010.  (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 23-24).

36.     STA Kerr did not put Plaintiff's handcuffs or leg shackles on too tight nor did he force Plaintiff to walk excessively or unreasonably fast. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 25).

37.     Plaintiff did not complain to the ERT that he could not breathe; rather, he was able to yell and make threats to the ERT while they transported him to the health care unit. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 26).

38.     STA Goddard did not try to break or injure Plaintiff's ankle, feet, wrists, fingers, or arms during the extraction or at any other time on July 2, 2010.  (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 27).

39.     STA Angel did not try to break or injure Plaintiff's ankle, feet, wrists, fingers, or arms during the extraction or at any other time on July 2, 2010. (Ex. B, DVD; Ex. C, Kerr Affidavit 28).

40.     When the ERT and Plaintiff arrived at the health care unit, Plaintiff made threats to the ERT and stated that he was going to stab members of the ERT when he gets the chance. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 30).

41.     None of Plaintiff's bones, including his fingers, wrist, legs, or arms, were broken or fractured by the Defendants on July 2, 2010. (Plaintiff Dep., Ex. D, p. 39, lines 11-22; Doc. 99-1, para. 4, Kris Rhoades Affidavit; Doc. 99-1, p. 4, Plaintiff's Medical Records).

42.     At the health care unit, Nurse Kris Rhoades ("Rhoades") examined Plaintiff and observed that Plaintiff's face was not swollen and that he did not have any swelling around his eye or his lip area. (Doc. 99-1, para. 4, Rhoades Affidavit; Doc. 99-1, p. 4, Plaintiff's Medical Records).

43.      Nurse Rhoades applied a band aid to Plaintiff's left wrist for a minor abrasion.   (Doc. 99-1, para. 4, Rhoades Affidavit; Doc. 99-1, p. 4, Plaintiff's Medical Records).

44.     Plaintiff did not complain to Nurse Rhoades that STA Kerr prevented him breathing. (Ex. B, DVD; Doc. 99-1, para. 4, Rhoades Affidavit; Doc. 99-1, p. 4, Plaintiff's Medical Records).

45.     After being examined by Nurse Rhoades, the ERT carried Plaintiff to his new room.  (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 32).

46.      When Plaintiff was being carried to his new room, he had no visible injuries on his face or neck. (Ex. B, DVD).

47.     Plaintiff was yelling at and threatening Kerr and the other members of the ERT as they carried him to this new room. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 33).

48.     Plaintiff's new room (SMU 1, room 7) was in the same living unit as his old room (SMU 1, room 1) and was right down the hall from his old room (SMU 1, room 1). (Plaintiff's Dep., Ex. D, p. 92, lines 19-24, p. 93, line 1).

49.     Plaintiff's new room (SMU 1, room 7) contained a toilet and a sink. (Ex. C, Kerr Affidavit, para. 37).

50.     Plaintiff's new room was in a clean condition and did not have blood, urine, or feces covering the walls or floors. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 34).

51.     Plaintiff did not complain about the temperature in his new room or state that it was cold. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 36).

52.     Plaintiff's clothes were removed and he was dressed in a State issued jumpsuit. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 39).

53.     Plaintiff stated that the jumpsuit that he was provided was his size. (Ex. B, DVD).

54.     The temperature for the residents' rooms at Rushville, including Plaintiff's room in SMU 1, was set at seventy-two (72) degrees Fahrenheit during the month of July 2010. (Ex. E, Ronald Hamann Affidavit, para. 6-7).

55.     While Plaintiff was being dressed, he was belligerently yelling, swearing, and making threats towards members of the ERT. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 39).

56.     STA Kerr did not "ram" his helmet up Plaintiff's buttocks or otherwise sexually assault Plaintiff on July 2, 2010. (Ex. B, DVD; Ex. C, Kerr Affidavit, para 40).

57.     Plaintiff did not complain that Kerr "rammed" his helmet up Plaintiff's buttocks or otherwise sexually assaulted Plaintiff. (Ex. B, DVD; Ex. C, Kerr Affidavit, para 40).

58.     Plaintiff's leg restraints were removed, his handcuffs were removed through the chuckhole in his door, and the ERT left him secured safely in his room with a mattress. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 41; Plaintiff Dep., Ex. D, p. 29, lines 6-11).

59.     On July 2, 2010, at approximated 1:25 p.m., Nurse Rhoades visited Plaintiff at his new room to give him his afternoon medications. (Doc. 99-1, para. 5, Rhoades Affidavit; Doc. 99-1, p. 4, Plaintiff's Medical Records).

60.     Plaintiff complained to Nurse Rhoades about minor pain to his leg and Nurse Rhoades gave him some Tylenol. (Doc. 99-1, para. 5, Rhoades Affidavit; Doc. 99-1, p. 4, Plaintiff's Medical Records).

61.     Plaintiff also saw another nurse later that night. (Plaintiff's Dep., Ex. D, p. 70, lines 15-24, p. 71, lines 1-4).

62.     Plaintiff's asserts that he told STA Kerr that he "was going to fuck him up" when he came out of his room, but he did not have any other interaction with STA Kerr after July 3, 2010. (Plaintiff's Dep., Ex. D, p. 36, lines 8-21).

63.     During the days following July 2, 2010, the Plaintiff was seen during rounds by Nana O'Donnell, Suzanne Osmer, and Lisa Brown. (Doc. 99-2, para. 4, Brown Affidavit; Doc. 99-3, para. 3, Osmer Affidavit; Doc. 99-4, para. 3, O'Donnell Affidavit).

64.     At no time did Plaintiff voice any serious medical complaints, nor did the nurses observe that Plaintiff had any serious medical conditions. (Doc. 99-2, para. 8, Brown Affidavit; Doc. 99-3, para. 5, Osmer Affidavit; Doc. 99-4, para. 5, O'Donnell Affidavit).

65.     Plaintiff admits that he saw nurses during their rounds every day while he was in room 7 and that he received Tylenol multiple times. (Plaintiff's Dep., Ex. D, p. 71, lines 11-20).

66.     Plaintiff also states he was allowed to leave his room and go to the gym, library, dayroom, and an outdoor "side yard patio" from July 2, 2010 through July 14, 2010. (Plaintiff's Dep., Ex. D, p. 86, lines 10- 24, p. 87, lines 1-7, 23-24, p. 88, lines 1-2).

67.     STA Logan did not use physical force against Plaintiff and did not physically restrain or extract Plaintiff from his room. (Ex. B, DVD; Plaintiff's Dep. Ex. D, p. 23, lines 15-24, p. 30, lines 18-24, p. 31, lines 1-5).

68.     Plaintiff merely alleges that STA Logan was present during the extraction, STA Logan saw the ERT put Plaintiff in room 7, and that STA Logan did not "intervene" during the extraction or when Plaintiff was put in room 7. (Plaintiff's Dep., Ex. D, p. 23, lines 15-24).

69.     Clifton McCalla ("McCalla") did not use physical force against Plaintiff and did not physically restrain or extract Plaintiff from his room. (Ex. B, DVD; Ex. C, Kerr Affidavit, para. 29).

70.     Plaintiff does not allege that McCalla had any physical contact with him or that McCalla directly caused him any physical injuries. (Plaintiff's Dep., Ex. D, p. 40, lines 4-18).

71.     Plaintiff merely alleges that McCalla "stood by and did nothing" when Plaintiff was extracted from room 1 and placed in room 7. (Plaintiff's Dep., Ex. D, p. 40, lines 4-18).

72.     Plaintiff does not know what STA Clark's involvement in this lawsuit is or if she was even involved in the incident on July 2, 2010. (Plaintiff's Dep., Ex. D, p. 41, lines 9-13).

73.     Plaintiff admits he can't remember when STA Clark was present during the incident on July 2, 2010. (Plaintiff's Dep., Ex. D, p. 41, lines 18-19).

74.     Plaintiff states that he had no communication or interaction with McAdory during July 1-3, 2010. (Plaintiff's Dep., Ex. D, p. 45, lines 21-24, p. 46, lines 1-8).

75.     Plaintiff states that he does not remember seeing McAdory during the extraction and has no personal knowledge of where McAdory was during the extraction. (Plaintiff's Dep., Ex. D, p. 46, lines 14-22).

76.     Plaintiff states that he does not know if Haage was present and does not recall seeing Haage when Plaintiff was extracted from his room. (Plaintiff's Dep., Ex. D, p. 50, lines 3-20).

77.     Plaintiff's claim against Haage is that Haage did not provide Plaintiff with hygiene/cleaning items and did not "protect him from the cold." (Plaintiff's Dep., Ex. D, p. 49, lines 14-24, p. 50, lines 1-2).

78.     Plaintiff's only evidence of his claim against Haage is that Kerr allegedly told Plaintiff that Haage said that McAdory would not allow Plaintiff to have hygiene/cleaning items or materials to keep him warm. (Plaintiff's Dep., Ex. D, p. 49, lines 16- 24, p. 50, lines 1-2).

79.     Plaintiff admits that Hankins was not involved in the extraction and that Plaintiff did not personally communicate with Hankins about his complaints. (Plaintiff's Dep. Ex. D, p. 51, lines 14-24, p. 52, lines 1-7).

80.     Plaintiff admits that he has never met Phillips, has never had a conversation with Phillips, and does not even know if Phillips had knowledge of the extraction and Plaintiff's room conditions. (Plaintiff's Dep., Ex. D, p. 53, lines 1-18)

81.     Furthermore, Plaintiff admits that he has no personal knowledge if Phillips was involved in any of the claims in Plaintiff's complaint. (Plaintiff's Dep., Ex. D, p. 53, lines 1-18).

82. Plaintiff claims that he does not "have the slightest idea" about why he filed this lawsuit against Michelle Saddler ("Saddler"). (Plaintiff's Dep., Ex. D, p. 55, lines 6-19).

83. Plaintiff admits that as far as he knows, "Saddler had nothing to do with it" and that she "did nothing to me." (Plaintiff's Dep., Ex. D, p. 55, lines 6-19).

84. Plaintiff concedes that he was going to dismiss Saddler from the lawsuit and that he would not object to having Saddler dismissed (Plaintiff's Dep., Ex. D, p. 55, lines 6-19).

85. Plaintiff did not suffer any physical injuries from the alleged dirty conditions or the cold temperature while he was in room 7. (Doc. 99-1, pp. 4-5, Plaintiff's Medical Records).

86. On July 12, 2010, Plaintiff was removed from temporary special management status and placed on close status. (Ex. McAdory Affidavit, para. 3).

87. On July 12, 2010, Plaintiff was examined and treated by Dr. Hughes Lockard for alleged pain in Plaintiff's back as a result of him working out and lifting 100 lb. bags filled with water on the morning of July 2, 2010, before the ERT moved Plaintiff from his room. (Plaintiff's Medical Records, Doc. 99-1, p. 5).

88. Plaintiff admits that the Defendants did not injure his back and that his back was already injured before he was extracted. (Plaintiff's Dep, Ex. D, p. 33, lines 2-3).

## SUMMARY JUDGMENT STANDARD

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. R. Civ. P. 56(a). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion. *Vukadinovich v. Bd of Sch. Trs. of N. Newton Sch.,* 278 F.3d 693, 699 (7th Cir. 2002).

When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769 (2007); *Henning v. O'Leary,* 477 F.3d 492, 496 (7th Cir. 2007). Where a non-moving party's assertion of fact is "blatantly contradicted" and "utterly discredited" by evidence captured on a videotape of the encounter to the point that no reasonable jury could belief it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## ARGUMENT

### I. PLAINTIFF'S UNCONSTITUTIONAL FORCE CLAIM SHOULD BE DISMISSED

There is no reason to distinguish between convicted inmates and pretrial detainees in the context of unconstitutional force allegations. *Bell v. Wolfish,* 441 U.S. 520, 546 (1979); *Board v. Farnham,* 394 F.3d 469, 478 (7th Cir. 2005) (appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) without differentiation). The Seventh Circuit, in *Rice v. Correctional Medical Services*, unequivocally stated that excessive force claims under a substantive due process theory are to be decided using an Eighth Amendment standard. *Rice v. Correctional Medical Services*, 675 F.3d 650, 667-668 (7th Cir. 2012).

The core judicial inquiry in determining whether an official used unconstitutional force is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian,* 503 U.S. 1, 6-9 (1992). What constitutes an unnecessary and wanton infliction of pain, however, varies according to the nature of the alleged constitutional violation. *Hudson*, 503 U.S. at 5. There are several factors used to determine if unconstitutional force was used, including "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Filmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004).

Not every malevolent touch by a prison guard gives rise to a federal cause of action, the prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided the use of force is not of a sort repugnant to the conscience of mankind. *Hudson*, 503 U.S. at 9-10. What matters - and

what will generally be the decisive factor in cases such as this - is the mindset of the individual applying the force. *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009). This is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry. *Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1178 (2010). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid unconstitutional force claim. *Wilkins*, 599 U.S. at 1178; *Hudson*, 503 U.S. 1 (not every push or shove, even, if it may later seem unnecessary in the peace of a judge's chamber, violates a prisoner's constitutional rights).

The Supreme Court has held that where a non-moving party's assertion of fact is "blatantly contradicted" and "utterly discredited" by evidence captured on a videotape of the encounter to the point that no reasonable jury could belief it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Thus, to the extent that Plaintiff attempts to contradict the evidence captured on the video recording (Ex. B, DVD), the Court should not adopt Plaintiff's version of the facts for purposes of ruling on Defendants' Motion for Summary Judgment. *Scott*, 550 U.S. at 380.

On July 1, 2010, STA Goddard, Mayes, and Wilson reported that they observed Plaintiff hitting his door, yelling "either writing tablet or tact team" and that he was "going to tear this mother fucker up," making loud banging noises in his room, and had covered his door window in the evening on July 1, 2010. (Undisputed Material Fact ("UMF") no. 8). Based on the reports of Plaintiff's aggressive and destructive behavior and that Plaintiff had covered his door window, Defendant McAdory decided that the ERT was needed to escort Plaintiff to a new room so that the staff could remove the material covering the window and assess the condition and situation in Plaintiff's room. (UMF no. 9-11). On the

morning of July 2, 2010, the ERT gave Plaintiff six (6) loud verbal commands to come to his room door and be placed in handcuffs so that they could peacefully move him to a new room. (UMF no. 15-22). Plaintiff could have easily avoided the ERT from coming into his room and having to restrain him if he had simply followed STA Logan's commands. (UMF no. 15-22). The Plaintiff refused the commands, leaving the ERT with no choice but to enter Plaintiff's room. (UMF no. 20-24).

When the ERT proceeded into the room, they were confronted by Plaintiff who was in a crouched stance and was physically combative and resisting the ERT. (UMF no. 26-27). The ERT was able to restrain Plaintiff so that they could place him in restraints and move him out of his room. (UMF no. 27-30). The video recording clearly shows that the force used was necessary to subdue, restrain, and safely escort the Plaintiff who was combative, hostile, and uncooperative with the Defendants throughout the entire incident. (UMF no. 24-58). No rational jury could find that Defendants acted maliciously and sadistically to cause Plaintiff harm. (UMF no. 24-58). Rather, any use of force that was necessary to move Plaintiff to his new room was applied in a good-faith effort to maintain or restore discipline. *Hudson*, 503 U.S. at 6-9.

Pursuant to Plaintiff's deposition testimony, he only alleges an unconstitutional force claim against STAs Kerr, Goddard, and Angel. (Plaintiff's Dep., Ex. D, p. 31, lines 11-21, p. 37, lines 6-15, p. 39, lines 1-6). The video clearly shows that STAs Kerr, Goddard, and Angel did not use unconstitutional force against Plaintiff. (Ex. B, DVD, UMF no. 31-39). Rather, it is apparent that Plaintiff – who was belligerent, defiant, uncooperative, resistant, and making violent threats – was safely and properly carried and escorted to the HCU and his new room. (Ex. B, DVD). Although force had to be used to subdue Plaintiff and escort him to the HCU and his new room, no reasonable finder of fact could find that STAs Kerr,

Goddard, or Angel used force that was unconstitutional under the circumstances. *Wilkins*, 599 U.S. at 1178; *Hudson*, 503 U.S. 1.

Furthermore, when Plaintiff was taken to the HCU after the extraction, he was examined by Nurse Rhoades who observed that his face was not swollen and that he did not have any swelling around his eye or his lip area. (UMF no. 41-44). Plaintiff also conceded that his face was not swollen at that time. (Ex. B, DVD). Plaintiff did not complain to Nurse Rhoades that STA Kerr prevented him breathing. (UMF no. 44). Nurse Rhoades merely applied a band aid to Plaintiff's left wrist for a minor abrasion. (UMF no. 43). Moreover, the video recording clearly shows that Plaintiff had no visible injuries on his face or neck. (UMF no. 46).

Based on the video, the testimony of the Defendants, and Plaintiff's admissions, no reasonable jury could find that any unconstitutional force had been used on Plaintiff during the extraction on July 2, 2010. The Defendants did a remarkable job extracting Plaintiff from his room under the hostile and difficult circumstances that Plaintiff created and they should be commended on their professionalism.

## II.     PLAINTIFF'S FAILURE TO INTERVENE CLAIM SHOULD BE DISMISSED

In order to state a claim under the Eighth Amendment for failure to protect, a plaintiff bears the burden of establishing prison officials were "deliberately indifferent" to the fact that an inmate was in serious peril of being harmed. *Board v. Farnham,* 394 F.3d 469, 478 (7th Cir. 2005). In other words, in order to prevail, the plaintiff must demonstrate that he was at serious risk of being harmed and the defendant decided not to do anything to prevent that harm from occurring even though he could have easily done so. *Board,* 394 F.3d at 478; *Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994). Where no reasonable finder of fact could conclude that officers used unconstitutional force against

the plaintiff, the plaintiff's claim that the other defendants who were merely present and failed to intervene in the use of force also fails. *Fillmore v. Page,* 358 F.3d 496, 506 (7th Cir. 2004) (citing *Chavez v. Ill. State Police,* 251 F.3d 612, 652 (7th Cir.2001)).

Pursuant to Plaintiff's deposition testimony, he alleges a failure to intervene or protect claim against Defendants Goddard, Angel, Logan, McCalla, and Clark. (Plaintiff's Dep., Ex. D, p. 23, lines 16-20, p. 37, lines 8-11, p. 39. 1-2, p. 40, lines 11-13, p. 42, lines 7-10). As explained above, no reasonable finder of fact could conclude that Defendants used unconstitutional force on Plaintiff or that he faced a serious risk of harm during his extraction on July 2, 2010. (Ex. B, DVD). Furthermore, no reasonable officer or person in Defendants' position would have determined that Plaintiff was being harmed by the actions of the ERT; therefore, there would be no need for intervention. (Ex. B, DVD). Accordingly, none of the Defendants can be liable for failing to intervene or protect him from the alleged unconstitutional force. *Filmore*, 358 F.3d at 506. Moreover, Plaintiff failed to explain how Defendants could have intervened or protected him from any alleged unconstitutional force. Thus, no reasonable finder of fact could conclude that Defendants failed to intervene or protect him.

Plaintiff also stated during his deposition that he did not know what Amy Clark's involvement in the incident was (UMF no. 72). Plaintiff went on to claim that he only spoke to STA Clark once during the incident and that was over the intercom. (Plaintiff's Dep., Ex. D, p. 42, lines 20-23). These admissions demonstrate that Plaintiff has no evidence that STA Clark was aware of a serious risk of harm or had the ability to intervene; thus, she cannot be liable for failure to protect or intervene. *George v. Smith*, 507 F.3d 605, 609-610 (7th Cir. 2007) (only persons who actually participate in the violations are responsible).

Based on the video, the testimony of the Defendants, and Plaintiff's admissions, no reasonable finder of fact could find that the Defendants failed to intervene or protect him from a serious risk of harm during the extraction on July 2, 2010.

## III.   PLAINTIFF'S DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS CLAIM SHOULD BE DISMISSED

The Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). To determine whether an inmate's Eighth Amendment rights were violated by a deprivation, the violation is examined both objectively and subjectively. "First, the deprivation alleged must be objectively, sufficiently serious." *Sanville v. McCaughtry,* 266 F.3d 724, 733 (7th Cir.2001). An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir.1997). "[T]he sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue --  the sorts of ailments for which many people who are not in prison do not seek medical attention --" are not objectively serious medical needs under the Eighth Amendment. *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir.1996). The Constitution is not a charter of protection for hypochondriacs. *Id.*

Plaintiff has presented no evidence that he suffered from a serious medical need on the dates in question. Immediately after Plaintiff was removed from his room on July 2, 2010, he was taken to the HCU and was examined by Nurse Rhoades. (UMF no. 40-42). Nurse Rhoades examined Plaintiff and observed that Plaintiff's face was not swollen and that he did not have any swelling around his eye or his lip area. (UMF no. 42). Plaintiff also conceded that his face was not swollen at that time. (Ex. B, DVD). Nurse Rhoades's

merely noticed that Plaintiff had a red eye, a small abrasion to his lip, and a small abrasion to his left hand. (Doc. 99-1, para. 4, Rhoades Affidavit; Doc. 99-1, p. 4, Plaintiff's Medical Records). Nurse Rhoades applied a band aid to Plaintiff's left wrist for a minor abrasion. (UMF no. 43).

The video shows that Plaintiff did not suffer any serious physical injury to his face or neck and he was physically able to walk on his own accord, despite his defiance which required the ERT to carry him part of the way. (Ex. B, DVD). Plaintiff's alleged injuries are the types of ailments for which many people who are not in prison do not seek medical attention; thus, Plaintiff's ailments do not meet the objective standard of the Eighth Amendment. *Cooper*, 97 F.3d at 916. While Plaintiff subjectively complained about pain or discomfort, none of his alleged needs are ones that have been diagnosed by a physician as mandating treatment, or were so obvious that even a lay person could recognize the necessity for medical treatment. *Gutierrez*, 111 F.3d at 1373.

Even if the Court were to find that Plaintiff's skin abrasions constitute a serious medical condition, Plaintiff cannot prove the second requirement of a deliberate indifference claim, that is the subjective mental state component. *Estate of Miller, ex rel. Bertram v. Tobiasz,* 680 F.3d 984, 989 (7th Cir.2012). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. The Seventh Circuit also recognizes that a defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation. The deliberate indifference standard imposes a "high hurdle on plaintiffs because it requires a showing as something approaching a *total*

*unconcern* for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012). Furthermore, non-medical prison officials are entitled to rely on the opinions and treatment of medical professionals; thus, they will not be held liable for deliberate indifference when the prisoner is in the care of medical professionals. *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006).[2]

In this case, Plaintiff has presented no evidence that Defendants were deliberately indifferent to his serious medical needs. As stated above, Plaintiff was immediately taken to the HCU after he was removed from his room, despite the fact that he did not have a serious medical need. (UMF no. 29-43). At the HCU, Nurse Rhoades assessed Plaintiff, observed that Plaintiff's face was not swollen, that he did not have any swelling around his eye or his lip area, and did not have a serious medical need. (UMF no. 42). Nurse Rhoades applied a band aid to Plaintiff's left wrist for a minor abrasion. (UMF no. 43). Plaintiff was later visited two more times by nurses on July 2, 2010. (UMF no. 59-61).

Furthermore, during the days following July 2, 2010, the Plaintiff was seen during rounds by Nana O'Donnell, Suzanne Osmer, and Lisa Brown and at no time did Plaintiff voice any serious medical complaints, nor did they observe any serious medical conditions. (UMF no. 63-65). Plaintiff also admits that he saw nurses during their rounds every day while he was in room 7 and that he received Tylenol multiple times. (UMF no. 65). On July 12, 2010, Plaintiff was examined and treated by Dr. Hughes Lockard for alleged pain in Plaintiff's back as a result of him working out and lifting 100 lb. bags filled with water on the morning of July 2, 2010, before the ERT removed Plaintiff from this

---

[2] See also *Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir.2011) (If a prisoner is under the care of medical experts, a non-medical prison official will be justified in believing that the prisoner is in capable hands); *Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir.2009) (a layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference).

room. (UMF no. 87). Plaintiff admits that the Defendants did not injure his back and that his back was already injured before he was extracted. (UMF no. 88).

The actions of the Defendants clearly show that they took affirmative measures to get Plaintiff medical treatment after removing Plaintiff from his room and that they were not deliberately indifferent to his alleged medical needs. *Rosario v. Brawn*, 670 F.3d at 821-822. Plaintiff was in the care of medical professions from the time of the extraction on July 2, 2010 through July 12, 2010, when he saw Dr. Lockard. Furthermore, since none of the Defendants are medical professionals with the ability to diagnose and treat injuries, they cannot be not responsible for examining or treating Plaintiff's medical needs and are entitled to rely on the judgment and treatment from the medical professions. *Johnson*, 433 F.3d at 1011. Based on these uncontroverted facts, no reasonable finder of fact could find that Defendants were deliberately indifferent to his serious medical needs.

## IV. PLAINTIFF'S CONDITIONS OF CONFINEMENT CLAIM SHOULD BE DISMISSED

To prevail on an Eighth Amendment conditions-of-confinement claim, a plaintiff must demonstrate that the harm imposed to him because of his room conditions was "sufficiently serious" so as to deprive him of "the minimal civilized measure of life's necessities." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prisoner does not have a right to confinement in comfort. *Murphy v. Walker,* 51 F.3d 714, 721 (7th Cir.1995). Prison conditions may be harsh and uncomfortable without violating the Constitution. *Dixon v. Godinez,* 114 F.3d 640, 642 (7th Cir.1997). In evaluating a claim of exposure to extremely cold temperatures, the court is to assess various factors, including whether the prisoner had alternative means of warmth, the adequacy of those alternatives, the length of exposure to the extremely cold temperatures,

and whether he was forced to endure other harsh conditions in addition to the cold. *Id.* at 644. "Seventh Circuit holdings are *limited to instances of extremely cold temperatures or of extended exposure to cold.*" *Mounson v. Chandra*, 2009 WL 1209059, S.D.Ill. Case no. 3:04-cv-365 JPG (issued March 30, 2009); *see DelRaine v. Williford,* 32 F.3d 1024, 1031 (7th Cir.1994) (broken cell windows with wind chills between *negative 40 and negative 50 degrees*); *Henderson v. DeRobertis,* 940 F.2d 1055, 1056 (7th Cir.1991) (malfunctioning heating system when temperature was *22 degrees below zero*).

In this case, Plaintiff alleges that he suffered "cold" conditions between *July 2-July 12* of 2010. (Plaintiff's Dep, Ex. D, p. 47, line 16). However, Rushville set the temperature for the residents' rooms, including Plaintiff's room in SMU 1, at seventy-two (72) degrees Fahrenheit during the month of July 2010. (UMF no. 54). Plaintiff has not adduced any evidence that the temperature in his room was extremely cold or that that he had extended exposure to extremely cold temperatures. Plaintiff's new room (SMU 1, room 7) was in the same living unit as his old room (SMU 1, room 1) and was right down the hall from his old room (SMU 1, room 1). (UMF no. 48). Yet, Plaintiff did not allege that the temperature in his old room was too cold, despite the fact that it was just down the hall from room 7. Plaintiff did not complain about the temperature in his new room or state that it was cold when he was placed in his new room on July 2, 2010. (UMF no. 51). These facts clearly show that Plaintiff was not subject to cold temperatures or conditions that would violate the Constitution. *Gay v. Chandra*, 652 F.Supp.2d 959, 969 (S.D. Ill August 28, 2009) (to avoid summary judgment, a detainee must *provide evidence* showing "that the temperature of the room in which he was confined was excessively cold, or that he was exposed to extremely cold temperatures for an extended amount of time").

Furthermore, Plaintiff was dressed in a full body jumpsuit on July 2, 2010. (UMF no. 52). Plaintiff admits that he was allowed to leave his room (room 7) and go to the gym, library, dayroom, and an outdoor "side yard patio" from July 2, 2010 through July 14, 2010. (UMF no. 66). Thus, Plaintiff had ample opportunities for alternative means of warmth and was not exposed to cold temperatures for an extended period of time.

Plaintiff also asserts that his new room (SMU 1, room 7) was "nasty," had blood and hair "pasted" on the walls, that he was denied cleaning supplies and hygiene items, and that his jumpsuit was too small. (Plaintiff's Dep., Ex. D, p. 48, line 20, p. 49, lines 18-20, p. 69, lines 9-11). However, Plaintiff has no evidence that his room had blood or hair pasted on the walls. The video shows that Plaintiff's room did not have blood, hair, or other human matter on the walls. (UMF no. 50). Plaintiff's room was also equipped with a sink and a toilet. (UMF no. 50). Thus, Plaintiff had the ability to wash himself and keep himself clean. In addition, Plaintiff did not complain about the size of the jumpsuit, but rather said that the jumpsuit was his size. (UMF no. 53). Moreover, Plaintiff admits that he was allowed to leave his room (room 7) and go to the gym, library, dayroom, and an outdoor "side yard patio" from July 2, 2010 through July 14, 2010. (UMF no. 66). Thus, Plaintiff had ample opportunities to leave the alleged "filthy" conditions of his room.

Furthermore, Plaintiff does not allege nor has he provided any evidence that he suffered any physical injuries or was subjected to future harm from the alleged cold room, lack of hygiene items, and the "filth" on the walls of his new room. In *Harris v. Fleming,* 839 F.2d 1232 (7th Cir.1988), the Seventh Circuit considered an inmate's claim that he was denied toilet paper for five days, denied soap, a toothbrush and toothpaste for ten days, while "he was kept in a filthy, roach-infested cell." *Id.* at 1234. The Court noted that "[i]nmates cannot expect the amenities, conveniences and services of a good hotel;

however, the society they once abused is obliged to provide constitutionally adequate confinement." *Id.* at 1235-36. The Court then opined that "[a]lthough Harris experienced considerable unpleasantness, he suffered no physical harm," *id.* at 1235, and found that the conditions simply did not rise to the level of an Eighth Amendment violation.

In *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008), the Seventh Circuit considered a civilly committed detainee's claim for unconstitutional conditions of confinement involving peeling paint, foul odor and lack of air-conditioning in his cell, his inability to open his window without letting in bugs, and a cockroach infestation. The Court stated that although the plaintiff's conditions were "certainly unpleasant[,]…a reasonable jury could not conclude that [the plaintiff's] conditions of confinement were objectively serious enough to establish a constitutional violation." *Id.* at 894.[3]  Furthermore, the Court held that the Plaintiff did not have a claim for unsanitary cell conditions because he did not have any evidence that he suffered a serious physical injury from the conditions. *Sain*, 512 F.3d at 894.[4] Since Plaintiff did not provide evidence of any physical injuries suffered from the "room conditions," he failed to demonstrate that his room conditions were objectively

---

[3]  See also *Henderson v. Rednour*, 2012 WL 5844685, S.D.Ill. Case no. 12-1113, issued November 19, 2012 (cell conditions of 24-hour illumination, no mattress or plumbing, and foul odors were certainly unpleasant, but were not sufficiently serious enough  to meet the objective component of the Eight Amendment); *Smith v. Schwartz*, 2011 WL 2115831 S.D.Ill. Case no. 10-721 (issued May 26, 2011) (a prisoner's claim that he was deprived of showers, cleaning supplies, and laundry service for thirty-two days did not rise to the level of a constitutional violation); *Lee v. Washington,* No. 97 C 4710, 1999 WL 759609, at 6-7 (N.D.Ill. Aug.31, 1999) (a prisoner's claim that he was denied personal hygiene items such as soap, toothpaste, and deodorant for two weeks did not rise to level of constitutional violation).

[4] See also *Hines v. Sheahan,* 845 F.Supp. 1265, 1269 (N.D.Ill.1994) (failure to allege any physical injury due to cell conditions defeats any contention of their objective severity); *Henderson v. Sheahan,* 196 F.3d 839, 848-49 (7th Cir.1999) (Constitutional claim for unsanitary cell conditions requires the plaintiff to produce evidence of actual physical injury); *Langston v. Peters,* 100 F.3d 1235, 1238 (7th Cir.1996) (prisoner must show that he suffered a physical injury which was caused by defendant's conduct).

serious to violate the Constitution. *Hines*, 845 F.Supp. at 1269; *Henderson*, 196 F.3d at 848-849.

Even if Plaintiff's allegations that he was denied a blanket, hygiene items, cleaning supplies for 10-12 days, that his room was filthy, and that his jumpsuit was too small are accepted as true, Plaintiff's conditions of confinement do not violate the Constitution. As explained by the case law cited above, denial of a blanket, hygiene items, cleaning supplies, or having a jumpsuit that is too small for 10-12 days does not present an objectively serious risk of harm and does not violate the Constitution. *Harris*, 839 F,2d at 1234-1235; *Hines*, 845 F.Supp. at 1269. Therefore, Plaintiff failed to demonstrate or provide evidence that his room conditions violated the Constitution.

In the alternative, Defendants were justified to limit or restrict the personal property that Plaintiff could have in his new room. Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and detainees. *Bell v. Wolfish*, 441 U.S. 520, 546-547, 99 S.Ct., 1861 (1979). Detention facility officials must be free to take appropriate action to ensure the safety of detainees and detention facility personnel and to prevent escape or unauthorized entry. *Id.* at 546-547. Accordingly, even when an institutional restriction infringes a specific constitutional guarantee, the practice must be evaluated in the light of the central objective of detention facility administration, safeguarding institutional security. *Id.* at 546-547. Part of the reason for moving Plaintiff to a new room was because he used materials/property to cover his door window, he was making loud banging noises in his room, and was behaving in an aggressive manner. (UMF no. 8-11). Thus, it was more than reasonable to limit the property that Plaintiff could

possess in his new room to avoid the security and safety concerns that Plaintiff had previously created. *Bell,* 441 U.S. at 546-547.

## V. DEFENDANTS THAT DID NOT HAVE PERSONAL INVOLVEMENT SHOULD BE DISMISSED

42 U.S.C. § 1983 creates a cause of action for damages based on personal liability; thus a plaintiff must show a defendant's personal involvement or participation, or direct responsibility for the constitutional violation of which he complains. *Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986); *Pepper v. Village of Oak Park,* 430 F.3d 809, 810 (7th Cir. 2005) (to be liable under § 1983 an individual defendant must have directly caused or participated in a constitutional deprivation). The doctrine of *respondeat superior,* under which a supervisor may be held liable for an employee's actions, has no application to Section 1983 actions. *Gayton v. McCoy,* 593 F.3d 610, 622 (7th Cir.2010).

Plaintiff does not allege that Kerr, Goddard, Angel, or Logan had any authority or control over what room Plaintiff was moved to or what items he was allowed to have. Thus, these Defendants were not personally involved in those decisions and cannot be personally liable. *George v. Smith*, 507 F.3d 605, 609-610 (7th Cir. 2007).

Plaintiff admits that he does not have any claim against Defendant Saddler and that she should be dismissed from this lawsuit. (UMF no. 82-84). Plaintiff admits that he has no personal knowledge whether Phillips was involved in any of his claims. (UMF no. 80-81). Plaintiff merely asserts that STA Kerr told him that McAdory had a conversation with Phillips about the incident. (Plaintiff's Dep. Ex. D, p. 52, lines 19-24, p. 53, lines 1-18). However, Plaintiff does not allege that Phillips ordered Plaintiff to be removed from his room or denied cleaning supplies; rather, he merely alleges that Phillips had a conversation with McAdory about it. (Plaintiff's Dep. Ex. D, p. 52, lines 19-24, p. 53, lines

1-18). Thus, Plaintiff fails to state how Phillips was personally responsible for any of the conditions of his confinement. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (no respondeat superior liability under 42 U.S.C. §1983; only persons who cause the violations are responsible).

Furthermore, a court may consider only admissible evidence in assessing a motion for summary judgment. *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 533 (7th Cir.2003). A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *See Logan v. Caterpillar, Inc.,* 246 F.3d 912, 925 (7th Cir.2001). 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c); *United States v. Harris,* 281 F.3d 667, 671 (7th Cir.2002). STA's Kerr's alleged statement to Plaintiff that McAdory had a conversation with Phillips was not made at trial or a hearing and Plaintiff seeks to use it to claim that Phillips knew that Plaintiff was "stripped out" and denied cleaning supplies. Plaintiff's only knowledge of Phillips involvement is an inadmissible hearsay statement. See *Gunville v. Walker*, 583 F.3d 979, 985-986 (7th Cir. 2009). Thus, Plaintiff has no evidence that Phillips had any involvement in Plaintiff's claims and he should be dismissed.

Plaintiff's only claim against Haage and Hankins is that he was "told" that they denied him cleaning supplies and bedding. (UMF no. 76-79; Plaintiff's Dep., Ex. D, p. 49, lines 14-24, p. 50, lines 1-2, p. 51, lines 14-24, p. 52, lines 1-15). Thus, this allegation is based on inadmissible hearsay evidence that cannot survive summary judgment. *Gunville*, 583 F.3d at 985-986. Plaintiff has no admissible evidence that Haage and Hankins had any involvement in Plaintiff's claims and they should be dismissed.

Plaintiff's claim against McAdory is that he was the supervisor who ordered that Plaintiff be removed from his room, dressed in a small jumpsuit, only provided a mattress, and denied cleaning and hygiene items. (UMF no. 74-75; Plaintiff's Dep., Ex. D, p. 48, lines 1-22). As explained above, McAdory had legitimate good-faith safety and security reasons to direct the ERT to move Plaintiff to a new room. (UMF no. 2-12). Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel. *Bell*, 441 U.S. at 546-547. McAdory cannot be liable for any injuries that Plaintiff suffered merely because he was the supervisor. *Chavez*, 251 F.3d at 651. Furthermore, Plaintiff's states that he has evidence that McAdory ordered the staff to deny him sheets or blankets, hygiene items, and to put him in a small jumpsuit. (Plaintiff's Dep., Ex. D, p. 49, lines 1-11). However, Plaintiff has not produced any admissible evidence establishing these claims. Therefore, McAdory should be dismissed.

## VI.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Qualified Immunity shields government officials from liability under Section 1983 "for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Brokaw v. Mercer County,* 235 F.3d 1000, 1022 (7th Cir. 2000). It protects "all but the plainly incompetent or those who knowingly violate the law.... If officers of reasonable competence could disagree on the issue [of whether or not an action was constitutional], immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). To defeat a claim of qualified immunity, a plaintiff must show that the defendants violated a constitutional right and demonstrate that the right in question was clearly established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Thus, when analyzing a qualified immunity

defense, courts consider whether the alleged facts demonstrate a constitutional violation, and whether the constitutional right was clearly established. *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151; *see also Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir.2010) ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

     As explained above, Plaintiff has failed to allege facts demonstrating that Defendants violated his Constitutional rights. Defendants acted in accordance with the Constitutional principles that were clearly established at the time of the alleged violations. To the extent that any authority suggests that Defendants violated Plaintiff's Constitutional rights, it would be new law that was not clearly established at the time of the alleged violations. Therefore, Defendants are entitled to qualified immunity.

## CONCLUSION

Wherefore, for the above and foregoing reasons, Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment and dismiss Plaintiff's claims against them.

Respectfully submitted,

MICHELLE SADDLER, LARRY PHILLIPS, JAMES HAAGE, EUGENE MCADORY, JOSEPH HANKINS, AMY CLARK, MICHAEL KERR, CHAD GODDARD, CLIFTON MCCALLA, JONATHON ANGEL, and RICHARD LOGAN,

Defendants,

Robert Rottach #6302887
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62706
(217) 782-1841 Phone
(217) 524-5091 Fax
E-Mail:  rrottach@atg.state.il.us

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendants.

Of Counsel.

By:   s/Robert Rottach_____
        Robert Rottach
        Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

TERRY C. JOHNSON #B-45089,      )
                                )
                  Plaintiff,    )
        -vs-                    )        No. 10-3279
                                )
MICHELLE R. B. SADDLER, et al., )
                                )
                  Defendants.   )

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2013, I electronically filed Memorandum of Law in

Support of Defendants' Motion for Summary Judgment with the Clerk of Court using the

CM/ECF system which will send notification of such filing to the following:

dbitner@heylroyster.com
tpowell@heylroyster.com

and I hereby certify that on March 1, 2013, I mailed by United States Postal Service, the

document to the following non-registered participant:

Terry C. Johnson #B-45089
Rushville Treatment & Detention Facility
1680 E. County Farm Road
Rushville, Illinois 62681

Respectfully submitted,

 \s\Robert Rottach
Robert Rottach #6302887
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:   (217) 782-1841
Facsimile:   (217) 524-5091